# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) Docket no. 2:18-cr-00078-GZS |
| HUSSIEN NOOR HUSSIEN, | ) |
| Defendant. | ) |

## ORDER ON MOTION TO SUPPRESS

Before the Court is Defendant's Motion to Suppress (ECF No. 29). The Court held an evidentiary hearing on September 25, 2018. As explained herein, the Court now DENIES the Motion.

## I. FACTUAL FINDINGS

The following facts are drawn from the preponderance of the evidence based upon the Court's consideration of the testimony of Special Agent Janine Rocheleau and all of the exhibits admitted at the hearing on Defendant's Motion:

On the morning of March 20, 2018, Special Agent James Sauer, Special Agent Jeremy Anderson, both with the U.S. Department of State, Diplomatic Security Service (DOS-DSS), along with another DOS-DSS administrative employee, traveled to Vermont. Once there, they met with Special Agent Janine Rocheleau of the U.S. Department of Housing and Urban Development, Office of Inspector General (HUD-OIG).

SA Sauer had previously contacted SA Rocheleau in June 2017 seeking her assistance in locating an individual that he believed was living in Section Eight housing in Vermont. SA

Rocheleau was able to find an address for Hussien Noor Hussien, the target of Sauer's investigation. Thereafter, Rocheleau conducted surveillance of the address in question and ultimately identified two vehicles registered to Hussien.

With this initial surveillance complete, Rocheleau met up with her three colleagues from DOS-DSS shortly before noon on March 20. Dressed in plain clothes with no weapons displayed, all four of them drove in a single vehicle to Hussien's residence in Winooski, Vermont. They hoped they would find Hussien Noor Hussien at his residence and interview him. Upon arrival, they noticed that none of the vehicles Hussien was thought to drive were present at the residence. SA Rocheleau then recognized a Toyota Highlander that she believed belonged to Hussien at a nearby red light. The agents followed that vehicle to a local TD Bank and parked in the bank parking lot. Once parked, SA Sauer and SA Rocheleau exited the vehicle and walked around the bank where they ultimately encountered Hussien in his vehicle having just apparently conducted a banking transaction at a drive-up window teller. SA Sauer approached Hussien's vehicle, identified himself, and indicated he would like to speak with Hussien about some passport issues. Hussien indicated he would talk to the agents and SA Sauer then asked him to park his car in a nearby parking spot at which point the Sauer, Rocheleau, and Anderson approached his vehicle on foot.

Initially, Rocheleau approached the driver side of Hussien's SUV while Sauer and Anderson went over to the passenger side of the parked vehicle. Because it was a cold, the agents asked if they could enter the vehicle, which Hussien allowed. At that point, SA Sauer got in the front passenger seat and SA Anderson got in the rear passenger seat. SA Rocheleau stood by the driver side door, a position from which she could watch Hussien's hands and make sure everybody

was safe.[1] Because the driver side window was rolled down, SA Rocheleau could hear the entirety of the interview from this position. SA Anderson recorded the entire interview.[2]

SA Sauer began the interview by giving Hussien a false statement warning. He then provided Hussien with written *Miranda* warnings in both English and Somali. See Gov't Exs. 3A & 3B. Hussien indicated he could not read either version of the written warning and needed further explanation. SA Sauer then proceeded to give Hussien an oral *Miranda* warning.

SA Sauer then began his interview by showing Hussien a photograph. Hussien indicated he knew the man in the photograph "from the refugee camp" and indicated his name was "Abukar Addullah." SA Sauer then stated, "when you came to the United States you said you were him." Hussien then proceeded to provide more details about how he was married to the wife of the man in the photograph. Sauer proceed to ask a series of questions about Hussien's children and their names, his birthdate, and his employment. Hussien was able to understand and answer all of these questions. In response to some of Sauer's questions, Hussien clearly indicated he did not understand the question and sought clarification. As the questioning continued, Hussien acknowledged that he used the name "Abukar" when he filled out paperwork in the refugee camp.

As the interview progressed, SA Sauer explained to Hussien that the agents had already spoken with multiple people who indicated that Hussien "pretended to be Abukar Hasson Abdul so [he] could come to the United States with [his first wife] and her children." (Gov't Ex. 2 at 39.) While acknowledging having gone by an alternative name, Hussien maintained he did not have a problem.

---

[1] There was a child's car seat installed in the back of the vehicle behind the driver's seat.

[2] See Gov't Ex. 1 (audio recording) & 2 (transcript of audio recording). To the extent that the Court cites or relies upon the transcript in this Order, it has listened to the full audio recording and determined that those portions of the transcript correctly reflect the audio recording.

After SA Sauer completed his questioning of Hussien, SA Rocheleau, who was still standing by the driver's side window, proceeded to ask Hussien some questions regarding his use of both of his current name and his prior name, Abukar Abdul, on various Section Eight housing paperwork. She also asked what name Hussien used when interacting with his family.

As the interview ended, SA Sauer provided Hussien with a copy of his business card and told Hussien, "We might have to talk later on. I'm going to see if I can get this straightened out for you." (Gov't Ex. 2 at 60.) Sauer and the other agents thanked Hussien and exited the vehicle, which had remained running for the entirety of the interview. The whole interview lasted approximately fifty minutes. During that time, Hussien never asked to end the interview or speak with an attorney.

## II. DISCUSSION

Defendant Hussien Noor Hussien is presently charged in a three-count indictment with Personage or Misuse of Papers in Naturalization Proceedings, in violation of 18 U.S.C. § 1424 (Count One), Knowing Procurement of Naturalization Contrary to Law, in violation of 18 U.S.C. § 1425(a) & 8 U.S.C. § 1451(c) (Count Two), and Making False Statements on a Passport Application, in violation of 18 U.S.C. § 1542 (Count Three). Via the pending motion, Defendant seeks to suppress statements he made during the March 20, 2018 interview asserting that he was subjected to a custodial interrogation and did not voluntarily, knowingly and intelligently waive his *Miranda* rights.

In general, "the prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Miranda v. Arizona, 384 U.S. 436, 444 (1966). While the Court begins with the presumption that a defendant did not waive his right to remain

4

silent, the Government may prove a valid waiver based on "a preponderance of the evidence" regarding the "totality of the circumstances." United States v. Palmer, 203 F.3d 55, 60 (1st Cir. 2000).

In this case, the Court first considers whether Hussien was subjected to a custodial interrogation. "In the absence of a formal arrest, whether an individual is in *Miranda* custody depends on whether there is a 'restraint on freedom of movement of the degree associated with a formal arrest.'" United States v. Infante, 701 F.3d 386, 396 (1st Cir. 2012) (quoting Maryland v. Shatzer, 559 U.S. 98, 112 (2010)). The First Circuit has identified several factors for courts to consider, including "whether the suspect was questioned in familiar or at least neutral surroundings, the number of law enforcement officers present at the scene, the degree of physical restraint placed upon the suspect, and the duration and character of the interrogation." See id. (quoting United States v. Hughes, 640 F.3d 428, 435 (1st Cir. 2011)).

As to the first factor, the Court readily concludes that Hussien was interviewed in familiar, neutral surroundings, namely, a public parking lot during daylight hours in his own vehicle, which remained running for the duration of the interview. There were three law enforcement officers present at the interview but all were in plain clothes with no weapons displayed. Thus, the number and appearance of the agents was not "overwhelming." United States v. Swan, 842 F.3d 28, 32-33 (1st Cir. 2018) ("We have previously declined to find that a defendant was in custody even when confronted by as many as five police officers.") Hussien was not physically restrained in any way. Finally, the entire taped interview lasted fifty minutes and ended amicably. See Swan, 842 F.3d at 33 (noting that ninety-minute interviews have been found to be "not necessarily custodial").

Notwithstanding all of these findings, Defendant argues "[h]aving two agents seated in a vehicle, with another flanking the driver's side door would seem reasonably described as a 'police dominated atmosphere.'" (Def. Reply (ECF No. 32), PageID # 113.) Notably, SA Rocheleau, the only witness at the hearing, credibly testified that she would have moved to allow Hussien to exit his vehicle if asked to do so. However, given Hussien's ownership of the vehicle and its location, the Court ultimately considers whether a reasonable person would "have felt he . . . was not at liberty to terminate the interrogation and cause the [agents] to leave" his vehicle. Infante, 701 F.3d at 397 (applying this alternative inquiry "[w]hen an individual is unable to leave the place of the interrogation solely due to circumstances incident to medical treatment") (internal quotations omitted). Considering the totality of the circumstances and tenor of the interview, the Court concludes that a reasonable person would have felt he could end the interview and ask the officers to exit his vehicle. Therefore, having considered all of the factors, the Court concludes the March 20th interview was noncustodial.

Alternatively, assuming that the interview could be deemed a custodial interview, the Court proceeds to consider whether Hussien voluntarily, knowingly, and intelligently waived his *Miranda* rights. Before introducing a statement made while in custody, it is the Government's burden to prove by a preponderance of the evidence that Hussien made a valid waiver of those *Miranda* rights. See United States v. Downs-Moses, 329 F.3d 253, 267 (1st Cir. 2003). The first step in meeting this burden is proving that Hussien received a *Miranda* warning that he understood. After all, as this Court has previously acknowledged, "a waiver of *Miranda* rights cannot be voluntary, knowing and intelligent if the Defendant does not understand the language in which her *Miranda* rights are read." United States v. Le, 377 F. Supp. 2d 245, 257 (D. Me. 2005), aff'd sub nom. United States v. Cao, 471 F.3d 1 (1st Cir. 2006).

In this case, Hussien clearly indicated that he could not read the written *Miranda* warnings that were provided to him in English and Somali. However, Hussien also was provided a verbal *Miranda* warning. Having listened to the entirety of the recorded interview, it is apparent that Hussien spoke and understood English, and demonstrated the ability to communicate when he needed clarification. In short, the Court is satisfied that Hussien understood the verbal *Miranda* warning provided by SA Sauer. See, e.g., United States v. Sweeney, 887 F.3d 529, 536 (1st Cir. 2018), cert. denied, No. 18-5038, 2018 WL 3224189 (Oct. 9, 2018) (concluding that the defendant's apparent inability to read and sign a *Miranda* form without his eyeglasses did not foreclose finding a valid waiver considering "the totality of the circumstances"). In fact, the substantive interview started after Hussien ultimately responded to SA Sauer's verbal *Miranda* warning by asking, "What do you want to know?" Under these circumstances, "[w]here the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent." Berghuis v. Thompkins, 560 U.S. 370, 384 (2010).

Defendant also argues that his limited English skills impacted the voluntariness of his statements. Faced with a defendant's challenge to the voluntariness of his *Mirandized* statements, the Government must prove by a preponderance of the evidence that the statements it seeks to use were uncoerced and made voluntarily. United States v. Hufstetler, 782 F.3d 19, 22 (1st Cir. 2015). The Court must "balance the officers' tactics with the unique background of each individual suspect" and consider the "totality of the circumstances" to determine whether "the government's conduct overtook the will of the defendant." Id. Here, the evidence submitted to the Court does not establish that the agents overtook Hussien's will in the course of the interview. Rather, the Court alternatively concludes that Hussien made a deliberate choice to answer the questions posed

to him and that his implicit waiver and the statements that followed were not the product of coercion or deception.  See, e.g., United States v. Jackson, 608 F.3d 100, 102-03 (1st Cir. 2010) (explaining that "coercion" includes "brutality, psychological duress, threats, unduly prolonged interrogation and many other circumstances, singly or in combination").

### III. CONCLUSION

For the reasons just explained, the Court DENIES Defendant's Motion to Suppress (ECF No. 29).

SO ORDERED.

    /s/ George Z. Singal  
    United States District Judge

Dated this 17th day of October, 2018.