1                  UNITED STATES DISTRICT COURT

2                       DISTRICT OF MAINE

3     _____

4     UNITED STATES OF AMERICA,              CRIMINAL ACTION

5              Plaintiff              Docket No:  2:18-78-GZS

6

7          -versus-

8

9     HUSSIEN NOOR HUSSIEN,

10                Defendant
      _____

11
                       Transcript of Proceedings

12

13    Pursuant to notice, the above-entitled matter came on for
      **Motion to Suppress** held before **THE HONORABLE GEORGE Z. SINGAL,**
14    United States District Court Judge, in the United States
      District Court, Edward T. Gignoux Courthouse, 156 Federal
15    Street, Portland, Maine, on the 25th day of September 2018 at
      1:11 p.m. as follows:

16

17    Appearances:

18    For the Government:    James W. Chapman, Jr., Esquire
                             Assistant United States Attorney
19
      For the Defendant:    Clifford Strike, Esquire
20                          Stephanie Knight, Esquire

21    Interpreter:  Mahmoud Hassan

22                  Lori D. Dunbar, RMR, CRR
                    Official Court Reporter
23
                  (Prepared from manual stenography and
24                    computer aided transcription)

25

```
 1              INDEX OF PROCEEDINGS            Page

 2
        Testimony:  (see below)
 3
                   INDEX OF WITNESSES
 4
        Janine Rocheleau  (called by Mr. Chapman)
 5          Direct Examination by Mr. Chapman        4
            Cross-Examination by Mr. Strike         27
 6          Redirect Examination by Mr. Chapman     43
            Recross-Examination by Mr. Strike       47
 7
                   INDEX OF EXHIBITS
 8
        Government
 9      Exhibit No.      Description          Admitted

10        1         Audio recording              19
          2         Transcript of audio recording 20
11        4A        Aerial photograph            13
          4B        Photograph                   13
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1              THE CLERK:  Please raise your right hand.  Do you
 2    solemnly swear that you will make true interpretations of the
 3    testimony and communications between the Court, counsel, and
 4    witnesses in this action according to the best of your skill
 5    and understanding, so help you God?
 6              THE INTERPRETER:  I do.
 7              THE CLERK:  Thank you.  Please state your name for
 8    the record.
 9              THE INTERPRETER:  Mahmoud Hassan, M-A-H-M-O-U-D,
10    H-A-S-S-A-N.
11              THE CLERK:  Thank you.
12                 (Open court.  Defendant present.)
13              THE COURT:  Good afternoon, counsel.
14              MR. CHAPMAN:  Good afternoon, Your Honor.
15              THE COURT:  We're here in Criminal Docket No. 18-78,
16    United States of America versus Hussien Noor Hussien.  We're
17    here today on a hearing on a motion to suppress, which has
18    been filed by the defendant.  Counsel, if you'd enter your
19    appearance, please, for the Government?
20              MR. CHAPMAN:  Yes, Your Honor, James Chapman for the
21    United States.
22              MR. STRIKE:  Good afternoon, Your Honor, Clifford
23    Strike for Defendant Hussien Noor Hussien.
24              MS. KNIGHT:  Good afternoon, Your Honor, Attorney
25    Stephanie Knight for the defendant.
```

```
 1              THE COURT:  Very good.  Everybody ready to proceed?

 2              MR. STRIKE:  Yes, Your Honor.

 3              THE COURT:  All right.  The record should indicate

 4      that there's an interpreter; thank you for being here.  So,

 5      counsel, don't speak too fast because we've got to have the

 6      interpreter work with the defendant.

 7          Ready to go?

 8              MR. CHAPMAN:  Yes, Your Honor.

 9              THE COURT:  Go right ahead.

10              MR. CHAPMAN:  Your Honor, the Government calls

11      Janine Rocheleau.

12              THE CLERK:  Please raise your right hand.  Do you

13      solemnly swear that the testimony you shall give in the cause

14      now in hearing shall be the truth, the whole truth, and

15      nothing but the truth, so help you God?

16              THE WITNESS:  Yes, I do.

17              THE CLERK:  Thank you, please be seated.  Please

18      state your name, spelling your first and last name for the

19      record.

20              THE WITNESS:  My name is Janine Rocheleau, and

21      that's spelled J-A-N-I-N-E, and the last is R-O-C-H-E-L-E-A-U.

22              THE COURT:  You may proceed.

23              MR. CHAPMAN:  Thank you, Your Honor.

24                          DIRECT EXAMINATION

25      BY MR. CHAPMAN:
```

1    Q.    Good afternoon.  Can you please tell us what you do for

2    a living?

3    A.    I am a special agent with the U.S. Department of

4    Housing and Urban Development, Office of Inspector General.

5    Q.    How long have you been a special agent with HUD?

6    A.    Since February of 2008.

7    Q.    Agent Rocheleau, please pull your seat a little bit

8    closer to that mic or pull that mic a little bit closer so we

9    can hear you.  Thank you.

10          And where are you assigned to work?

11   A.    The Manchester, New Hampshire, office.

12   Q.    And what region do you cover?

13   A.    I cover the Regions 1/2.  It's -- the geographical area

14   I cover is the state of Vermont, northern New York, and

15   Connecticut.

16   Q.    And where are you based out of?

17          THE INTERPRETER:  Excuse me, Your Honor.

18          THE COURT:  Is it too fast for you?

19          THE INTERPRETER:  A little bit fast, question and

20   answer.

21          THE COURT:  All right, let's slow down.

22          THE INTERPRETER:  If you can repeat that last

23   answer.

24   BY MR. CHAPMAN:

25   Q.    Please repeat your last answer.

1    A.    I cover the state of Vermont, Connecticut, and northern

2    New York.

3    Q.    And where are you based out of?

4    A.    My office is located in Manchester, New Hampshire.

5    Q.    And where do you live?

6    A.    I live in the state of Vermont.

7    Q.    Okay.  Now, were you asked to assist in the case

8    involving Hussien Noor Hussien?

9    A.    Yes, I was.  In June of 2017 I received a telephone

10   call from Special Agent Jim Sauer of DSS.  Special Agent Sauer

11   indicated that he was investigating an individual and that he

12   was trying to locate this individual.

13   Q.    And did you assist him in locating his address?

14   A.    Yes, I did.

15   Q.    And how did you do that?

16   A.    Special Agent Sauer had provided me with two names that

17   the individual was believed to be using, along with a Social

18   Security number.  I used that information and I ran it in

19   HUD's PIC database, which is the Public and Indian Housing

20   Information Center database.  And once I put that information

21   into the database it populated and the defendant's name

22   appeared, and it indicated that he was living in Section 8

23   housing.

24   Q.    Now, at some point in time did Agent Sauer tell you

25   that he was going to be coming to the Burlington area to

1    attempt to conduct an interview?

2    A.    Yes, he did.

3            THE COURT:  All right.

4            THE INTERPRETER:  Your Honor, it could be my hearing

5    problem.

6            THE COURT:  I'm sorry, I'm having trouble hearing

7    you, so if you'd just speak up.

8            THE INTERPRETER:  It could be just my hearing but

9    I'm not hearing very clearly.

10            THE COURT:  All right.  Is there -- would earphones

11    help?

12            THE INTERPRETER:  If you have a headphone it would

13    be --

14            THE CLERK:  I would need a few minutes to get that

15    together.

16            THE COURT:  All right, why don't we just try to keep

17    our voices up.  Speak right into the microphone.  Turn up the

18    volume a little bit, Lindsey, maybe that will help.  Okay, go

19    ahead.

20    BY MR. CHAPMAN:

21    Q.    And when was he going to attempt to conduct this

22    interview?

23    A.    On March 20th of 2018.

24    Q.    And before this interview did you do anything to

25    prepare?

1    A.    I did, I conducted surveillance of the defendant's

2    residence.  That was conducted on March 2nd, and at that time

3    I noticed that there -- I observed two vehicles in the

4    driveway.  I ran those -- the license plates in an Accurint

5    database, which identified those vehicles as being registered

6    to the defendant.

7    Q.    And did you do that on any other occasion, conduct

8    surveillance?

9    A.    I did.  On the morning of the interview on March 20th I

10   surveilled the defendant's residence to -- to make sure that

11   he was at the residence.  That's where the interview was going

12   to take place.

13   Q.    And did an interview in fact take place that day?

14   A.    Yes, it did.

15   Q.    And did you participate in the interview?

16   A.    Yes, I did.

17   Q.    And do you recognize the person that was interviewed on

18   that date in the courtroom?

19   A.    Yes, I do.

20   Q.    Can you please identify him and describe him for the

21   Court?

22   A.    Yes, he's sitting at the defense table.  He's wearing a

23   black suit, a white shirt, has a beard.

24        MR. CHAPMAN:  Your Honor, may the record reflect the

25   witness has identified the defendant?

```
 1              THE COURT:  So noted.
 2    BY MR. CHAPMAN:
 3    Q.    Now, did the interview in fact take place on
 4    March 20th?
 5    A.    Yes, it did.
 6    Q.    2018?
 7    A.    That's correct.
 8    Q.    And what was the plan for the interview that day?
 9    A.    We were going to attempt to interview the defendant at
10    his residence, and when -- there was four of us in the
11    vehicle.  You had Agent Sauer, myself, another DSS Special
12    Agent Anderson.  And there was a DSS employee; he was not an
13    agent.  I believe he was an analyst or an administrative
14    worker with the agency.  And we were going to interview him at
15    his residence.  And when we pulled up --
16    Q.    Let me -- let's do this in baby steps here.  Was there
17    any plan to arrest the defendant that day?
18    A.    No.
19    Q.    So what happened when your vehicle pulled up near the
20    defendant's residence?
21    A.    There were no vehicles in the driveway of the
22    residence.
23    Q.    Did anybody get out and knock on the door?
24    A.    No.
25    Q.    What happened next?
```

1    A.    So immediately after the residence there was a red

2    light.  And so we were pulling up in front of the residence

3    down the street.  I was able to look to my right and noticed

4    that there were no vehicles in the driveway.  So we were going

5    to drive around because the driveway touches two roads.  The

6    front of the house is on one road, the back of the house

7    touches another road, and the driveway connects the two.  So

8    we were going to drive around to the back side of the house on

9    that road to see if the vehicles that belonged to the

10   defendant and which I had observed earlier in the morning that

11   were in his driveway, to see if they were parked on the

12   roadway.

13   Q.    And then what happened?

14   A.    As we were waiting at the red light, I recognized the

15   vehicle in front of us as being one of the vehicles

16   belonging -- being registered to the defendant, at which time

17   I told Agent Sauer, I said, that's his vehicle, that's the

18   defendant's vehicle.

19   Q.    So what happened next?

20   A.    When the light turned green the defendant proceeded to

21   go straight and we followed him.

22   Q.    Now, at some point did you -- were you able to get a

23   look at the driver of the vehicle?

24   A.    We did.  At some point we were able to slightly pull

25   alongside enough so so we were able to see the person that was

1    driving the vehicle.  And both Agent Sauer and myself were

2    able to positively identify the individual driving the car as

3    the defendant.

4    Q.    Based on what?

5    A.    Based on his face, his -- the -- what he looked like.

6    Q.    Had you ever met him before?

7    A.    No, I never met him before but I did see photographs of

8    him.

9    Q.    All right.  So after determining that it was the

10   defendant driving this vehicle, registered to the defendant,

11   what happened next?

12   A.    We proceeded to follow the vehicle.  And we -- I don't

13   know the exact distance that we followed the vehicle, but it

14   was for a few minutes, and at which time the defendant turned

15   into a parking lot for the TD Bank.

16        THE COURT:  Let me ask the interpreter, can you hear

17   now okay?

18        THE INTERPRETER:  I can hear better now, Your Honor,

19   thank you.

20        THE COURT:  We have equipment available that you

21   can --

22        THE INTERPRETER:  That would be helpful.

23        THE COURT:  Would you prefer that?

24        THE INTERPRETER:  Yes.

25        THE COURT:  Okay, we're going to do that.  We'll

1    take a break; I'll wait here while we're doing it.  Go ahead.

2    Just wait, hold that question.

3                        (Pause)

4           THE COURT:  The record will indicate we've done a

5    hearing-impaired receiver for the interpreter.  Are you ready?

6           THE INTERPRETER:  Yes, Your Honor.

7           THE COURT:  All right, go ahead.

8    BY MR. CHAPMAN:

9    Q.    Agent Rocheleau, I'm going to hand you two exhibits,

10   Government Exhibit 4A and 4B.  Ask you to take a look at them,

11   and I'll ask you some questions about that after you look at

12   them.

13   A.    Okay.

14          THE INTERPRETER:  Your Honor, can they repeat that

15   last translation?

16          THE COURT:  You didn't hear the last answer?

17          THE INTERPRETER:  I did hear.

18          THE COURT:  Repeat it for him.  I'm not going to

19   have the witness repeat it if you heard it.  Just repeat it to

20   him.  You may proceed.

21   Q.    Before the break for the audio equipment did you say

22   that the defendant pulled up near a TD Bank?

23   A.    He turned into the parking lot of the TD Bank.

24   Q.    And taking a look at Government's 4A and 4B.  First,

25   can you identify what 4A is?

1    A.    4A appears to be an aerial shot of the TD Bank that I'm

2    speaking about.

3    Q.    And 4B?

4    A.    4B appears to be a street view of the TD Bank.

5    Q.    And are these from Google Maps?

6    A.    Yes, they are.

7    Q.    Even though you didn't take those photographs, do they

8    fairly and accurately depict the bank on the day of the

9    interview?

10   A.    Yes, they do.

11         MR. CHAPMAN:  Government moves for the admission of

12   4A and 4B.

13         THE COURT:  Any objection?

14         MR. STRIKE:  No objection, Judge.

15         THE COURT:  Admitted without objection, 4A, 4B.  Go

16   ahead.

17   BY MR. CHAPMAN:

18   Q.    What happened next when the defendant drove into the

19   parking lot of the bank?

20   A.    When we observed the defendant turn into the parking

21   lot of the bank, we pulled in and parked in front of the bank,

22   right on East Allen Avenue.

23   Q.    And directing your attention to 4B, the street view of

24   the bank, do you see a vehicle in this picture, a pickup

25   truck?

1    A.    Yes, I do.

2    Q.    And is that parked anywhere near where you and your

3    fellow agents parked on that day?

4    A.    Yes, we were parked right in that parking spot.

5    Q.    What happened next?

6    A.    Agent Sauer and myself, we exited the vehicle and we

7    walked to the other side of the bank and started to walk

8    towards the back of the bank to where we believed the

9    defendant had drove his vehicle.

10   Q.    And which street was that?

11   A.    That's Weaver Lane.

12   Q.    And what happened next?

13   A.    As we were approaching the rear of the bank, the

14   defendant was driving his vehicle and he was exiting -- he was

15   about to exit the parking lot.  It appeared that he had just

16   drove his car through the drive-through lane, which is a

17   window teller, and we -- we were walking up and he was pulling

18   out of that spot and --

19   Q.    What happened next?

20   A.    Then Agent Sauer identified himself and --

21   Q.    How did he do that?

22   A.    He verbally identified himself, and I believe that he

23   also showed his credentials.  And he explained that we would

24   like to speak with the defendant regarding some passport

25   issues that he had.

1    Q.    And where was he standing when he was speaking to the

2    defendant at this point?

3    A.    Next -- near the vehicle.

4    Q.    Which side of the vehicle?

5    A.    On the driver's side of the vehicle.

6    Q.    Was he or anybody else blocking his exit from the bank?

7    A.    No, no, there was -- nothing was in front of the

8    vehicle, just the exit of the bank, the bank parking lot.

9    Q.    After the -- after Agent Sauer explained that he wanted

10    to talk to the defendant about passport issues, what happened

11    next?

12    A.    The defendant agreed and Agent Sauer asked if he would

13    pull his vehicle over into a parking spot, and -- which the

14    defendant did.

15    Q.    All right, so directing your attention to Government

16    Exhibit 4A, which is the overhead view of the bank, do you

17    have a pen in front of you?

18    A.    I do.

19    Q.    If you could draw a number 1 with a circle to indicate

20    where the defendant first drove into the bank parking lot.

21    A.    Okay.

22    Q.    And then draw a number 2 with a circle to indicate the

23    parking spot that you and your colleagues parked.  Have you

24    done that?

25    A.    I did.

1    Q.    And next draw number 3 to indicate where you and Agent

2    Sauer first encountered the defendant as he was leaving the

3    drive-through lane.

4    A.    Okay.

5    Q.    And then draw a number 4 with a circle to indicate

6    approximately where the defendant parked after he was asked by

7    the agent for an interview.

8    A.    Okay.

9          MR. CHAPMAN:  May I approach?

10          THE COURT:  You may.

11    A.    May I clarify something that's on number 4?

12    BY MR. CHAPMAN:

13    Q.    Yeah.

14    A.    I put a number 4 on a vehicle where I believe that the

15    defendant parked.  However, there's multiple parking spots

16    there, and I don't know for certain which parking spot, but it

17    was generally -- it was one of those in that area.

18          MR. CHAPMAN:  Does the Court wish to look at that

19    exhibit at this point?

20          THE COURT:  I'll look at it later.  I've got it

21    noted.

22    Q.    So after the defendant pulled into one of those parking

23    spots on Weaver Lane -- am I correct in saying it was a

24    parking spot on Weaver Lane?

25    A.    Yes, that's correct.

1   Q.    After he pulled into one of those parking spots, what

2   happened next?

3   A.    I approached the driver's side window.  Agent Sauer

4   went over to the passenger's side, front passenger window.  At

5   that time I wasn't looking behind me, but Agent Anderson was

6   standing next to me as well.  And then Agent Anderson had gone

7   over to the passenger's side of the vehicle on the rear --

8   rear passenger's side of the vehicle.

9   Q.    So am I correct in saying that the initial encounter

10  was just you and Agent Sauer?

11  A.    Correct.

12  Q.    By the drive-through lane?

13  A.    Correct.  I don't know what was going on behind me.

14  Agent Anderson could have been walking up behind me at that

15  point.

16  Q.    Okay.  Did anybody get in the vehicle with the

17  defendant?

18  A.    Yes, Agent Sauer got in the front passenger seat, and

19  Agent Anderson got in the vehicle on the rear passenger seat.

20  Q.    Now, was the interview recorded?

21  A.    Yes, it was.

22  Q.    And who operated the recording device?

23  A.    Agent Anderson from the rear of the vehicle.

24  Q.    And where were you standing during the interview?

25  A.    I was standing on the outside of the vehicle next to

1    the front driver's side door.

2    Q.    And was the driver's window down or up?

3    A.    It was down.

4    Q.    And what was the weather that day?

5    A.    It was cold.

6    Q.    March 20th in Burlington, it can be a cold day?

7    A.    It was cold, yes.

8    Q.    So could you hear the interview as it was proceeding?

9    A.    Yes, I was able to.

10   Q.    And did you participate at all during the interview?

11   A.    I did.

12   Q.    Have you listened to a recording of the interview?

13   A.    Yes, I have.

14   Q.    I'm going to show you what's been marked as Government

15   Exhibit 1 and Government Exhibit 2.  First tell us what

16   Government Exhibit 1 is.

17   A.    Exhibit 1 is a CD that contains the -- a copy of the

18   audio recording.

19   Q.    And have you listened to that CD?

20   A.    Yes, I did.

21   Q.    And how do you know that?

22   A.    I initialled the CD and I also dated next to my

23   initials.  I put yesterday's date when I listened to the CD.

24   Q.    And had you listened to a recording before yesterday?

25   A.    Yes, I did.

```
 1              MR. CHAPMAN:  The Government moves for the admission

 2   of --

 3   BY MR. CHAPMAN:

 4   Q.    Let me ask you this.  Does the CD -- the recording on

 5   the CD fairly and accurately depict the conversation?  Is it a

 6   fair and accurate recording of the conversation?

 7   A.    Yes, it is.

 8              MR. CHAPMAN:  Government moves for the admission of

 9   Government Exhibit 1.

10              THE COURT:  Any objection?

11              MR. STRIKE:  No, sir.

12              THE COURT:  Admitted.

13   Q.    Government Exhibit 2, what is that?

14   A.    This is a transcript of the audio recording.

15   Q.    And have you had a chance to review that?

16   A.    Yes, I have.

17   Q.    And as late as yesterday you were reviewing it with me,

18   correct?

19   A.    That's correct.

20   Q.    Did you make any changes to the transcription done by

21   The Recording Group?

22   A.    Yes, I made several edits to this transcription.  There

23   were several additions and several cross-outs.

24   Q.    Based on your recollection of the conversation and your

25   listening to the CD?
```

1    A.    Based -- strictly based on the audio recording.

2    Q.    Okay.

3         MR. CHAPMAN:  The Government moves for the admission

4    of Government Exhibit 2 as an aid for the court.

5         THE COURT:  Any objection?

6         MR. STRIKE:  Judge, if the Government is only

7    admitting it as an illustrative aid and not as an exhibit per

8    se, then I don't have any objection.  As the Court is well

9    aware, the tape itself rules.  There was obviously some

10   differences in the recording between the original

11   transcription and what the agent, if you will, edited.  So I

12   put my objection in that form, Judge.

13        THE COURT:  What I'm hearing is the transcript is

14   being offered as a written transcript of what this agent heard

15   on the recording; it's offered to assist the Court in

16   listening to the recording.  If there's a difference between

17   the transcript and what's in the recording, the recording

18   governs.

19        MR. CHAPMAN:  That's how I'm offering it, Judge.

20        MR. STRIKE:  Understood, Judge, thank you, sir.

21        THE COURT:  Any objection on that basis?

22        MR. STRIKE:  No, sir.

23        THE COURT:  Thank you.

24   BY MR. CHAPMAN:

25   Q.    Agent Rocheleau, are you heard on the recording at all?

```
 1    A.    Can you repeat the question?

 2    Q.    Do you hear yourself in the recording?

 3    A.    Yes, I do.

 4    Q.    And at the very beginning of the recording whose voices

 5    are heard?

 6    A.    At the very beginning the voice is myself, and that's

 7    me identifying myself to the defendant.

 8    Q.    And then the next voice?

 9    A.    The next voice I believe was Agent Anderson identifying

10    himself.

11    Q.    Let's play the beginning of the recording.

12                         (Audio played.)

13    BY MR. CHAPMAN:

14    Q.    All right, who's the third voice we heard?

15    A.    That's Agent Sauer.

16                         (Audio played.)

17    Q.    And whose voice do you hear responding to Agent Sauer

18    there?

19    A.    The defendant.

20                         (Audio played.)

21    Q.    So is he showing him anything at this point?

22    A.    He's showing him I believe the Miranda warnings, the

23    Somali version of the Miranda warnings.

24                         (Audio played.)

25    Q.    When he said I can't understand the reading, could you
```

1    see what he was referring to?

2    A.    He -- Agent Sauer had handed him a piece of paper.  My

3    recollection is that it was the Miranda warnings, which were

4    in the Somali language.

5                         (Audio played.)

6    BY MR. CHAPMAN:

7    Q.    When Agent Sauer asked him, you don't understand this,

8    what was he referring to with that question?

9    A.    The Miranda warning, the document, that -- written in

10    Somali and also English.

11    Q.    Okay.

12                         (Audio played.)

13    Q.    So what's happening there, Agent Rocheleau?

14    A.    So the defendant was saying that he didn't understand

15    the written document, the Miranda warnings which were in

16    Somali and also English.  And then he proceeded to tell Agent

17    Sauer, what do you want to know or words -- if you want me to

18    quote it exactly I would have to look at the transcript right

19    now.

20    Q.    All right.  So at any point did the defendant indicate

21    he didn't understand what Agent Sauer told him as far as his

22    rights?

23    A.    No, no.  I -- it was my understanding that he was --

24    didn't understand the document, the writing.

25    Q.    Okay.

1    A.    It's possible that he didn't understand what Agent

2    Sauer was verbally saying.

3    Q.    Now, during the initial encounter before the recording,

4    did anybody display any weapons?

5    A.    No.

6    Q.    Did anybody tell the defendant he was under arrest?

7    A.    No.

8    Q.    Anybody tell the defendant he would be arrested if he

9    didn't answer questions?

10    A.    No.

11    Q.    At any point during the interview did the defendant ask

12    that the interview end?

13    A.    No.

14    Q.    Did he ever ask if he could speak to his lawyer?

15    A.    No.

16    Q.    Did he ever ask for clarification about any particular

17    question that was asked?

18    A.    He did.  There were several occasions when the

19    defendant said, I don't understand, or words similar to that,

20    which Agent Sauer restated what he -- the question or he

21    worded the question differently.

22    Q.    And then did the defendant answer the new question or

23    the restated question?

24    A.    Yes, he did.

25    Q.    Did you understand the defendant?

 1    A.    I could understand the defendant.

 2    Q.    At any -- at some point did you get a chance to ask

 3    questions?

 4    A.    Yes, I did.

 5          MR. CHAPMAN:  I'm going to skip ahead in the

 6    recording, Judge, to approximately 36 minutes and 23 seconds.

 7                        (Audio played.)

 8    BY MR. CHAPMAN:

 9    Q.    So after Agent Sauer said I really appreciate, and then

10    there was another voice, who was that?

11    A.    That was me.

12    Q.    And did you have questions for the defendant?

13    A.    Yes, I did.

14    Q.    And where were you standing at that point?

15    A.    I was outside the vehicle next to the driver's side

16    door.

17    Q.    Same place you were at the beginning of the interview.

18    A.    For the entirety of the interview.

19                        (Audio played.)

20    Q.    So did -- at any point during your questioning of the

21    defendant did he indicate he didn't understand you?

22    A.    No, not that I recall.

23    Q.    And at any point during your questioning did you have

24    difficulty understanding him?

25    A.    No.

1   Q.    And was the entire interview conducted in English?

2   A.    Yes, it was.

3   Q.    Was there an interpreter available or with you?

4   A.    There was not an interpreter there, no.

5   Q.    At the conclusion of the interview, I'm going to speed

6   up to you, I think it's approximately 49 minutes and 53

7   seconds.

8                          (Audio played.)

9   BY MR. CHAPMAN:

10  Q.    Agent Rocheleau, why did the interview end at that

11  point?

12  A.    There were no further questions to ask.

13  Q.    At any point -- well, strike that.

14          Was the defendant in your mind coerced during this

15  interview?

16  A.    No.

17          MR. STRIKE:  Object, calls for speculation.  She

18  doesn't know what's in my client's mind.

19          THE COURT:  I'm just accepting it from her

20  observation.

21  Q.    Your answer is no?

22  A.    My answer is no.

23  Q.    At the -- after the recording ended, what happened

24  next?

25  A.    We -- the -- Agent Sauer, Agent Anderson, and myself

1    returned to Agent Sauer's vehicle.  We all got in the vehicle

2    and drove back to the -- HSI's parking lot.

3    Q.    Is this Homeland Security Investigations?

4    A.    That's correct.

5    Q.    Are they in South Burlington?

6    A.    Yes, they are.

7    Q.    Did you leave before the defendant left the area?

8    A.    I don't recall.

9    Q.    Did you see where the defendant went after the

10    interview?

11    A.    No, I did not.

12              MR. CHAPMAN:  Nothing further, Your Honor.

13              THE COURT:  All right, let me just ask you a couple

14    questions.  Were any of you in uniform?

15              THE WITNESS:  No, we were all in plainclothes.

16              THE COURT:  Did you -- any of you have a visible

17    weapon?

18              THE WITNESS:  I -- it was cold that morning, and I

19    believe we were all wearing our coats, so any weapon should

20    have been covered.  If the coat -- if one of the agents' coats

21    were open it's possible when they moved the coat moved a

22    little bit.

23              THE COURT:  Were the weapons all inside a jacket?

24    Were they shoulder holsters?

25              THE WITNESS:  I can only speak for myself, my own

 1    weapon, and that would be worn on my waist.

 2            THE COURT:  Did you see any weapons during this

 3    interview?

 4            THE WITNESS:  No, I did not.

 5            THE COURT:  Any other questions?  Mr. Strike,

 6    cross-examination?  Did you have more questions?

 7            MR. CHAPMAN:  No, Your Honor.

 8            THE COURT:  Mr. Strike?

 9            MR. STRIKE:  Thank you, Judge.

10                          CROSS-EXAMINATION

11    BY MR. STRIKE:

12    Q.    It's Agent Rocheleau, right?

13    A.    Yes.

14    Q.    Now, when you parked in front of the TD Bank, as you

15    indicated in the Government's Exhibit 04A, you marked that you

16    parked directly in the front of that bank; is that correct?

17    A.    Yes, that's -- I believe that's where we parked.

18    Q.    Okay.  And defendant had driven into the ATM area,

19    taking a right prior to where you parked.

20    A.    He took a left into the parking lot.

21    Q.    Okay.  But he didn't take a left up Weaver Lane.

22    A.    No, no.

23    Q.    All right.  Did you see him conduct a transaction at

24    the drive-through?

25    A.    No.

1    Q.    When you left Agent Sauer's vehicle that morning or I

2    guess early afternoon, did both you and Agent Sauer and Agent

3    Anderson exit the vehicle?

4    A.    I know I exited the vehicle.  I know Agent Sauer exited

5    the vehicle.  I don't know when Agent Anderson exited the

6    vehicle.

7    Q.    And what was the name of the other individual that was

8    apparently with you?

9    A.    I don't know that person's name.  That's the first time

10    I saw them.

11    Q.    And that individual remained in Agent Sauer's vehicle?

12    A.    The entire time.

13    Q.    Yes, the entire time?

14    A.    Yes.

15    Q.    What was that person's role?

16    A.    I -- I don't know why that person was there.  It could

17    have been as a ride-along.  The person was not involved in the

18    interview at all.

19    Q.    Now, you walked around the bank going up Weaver Lane;

20    is that correct?

21    A.    That's correct.

22    Q.    And when you got to the area of the drive-through,

23    where were you positioned when the vehicle was asked to stop?

24    A.    I would say right towards the end of the bank, right

25    where the sidewalk and if a vehicle was pulling out of the

1    teller, the drive-through lane, right about there.

2    Q.    Where was Agent Sauer?

3    A.    He was to my right and slightly ahead of me.

4    Q.    And were you both displaying your credentials when you

5    asked the vehicle to stop?

6    A.    I did not speak with the defendant at that time.  Agent

7    Sauer was the one that did all of the talking at that point.

8    And I do believe that -- I know he verbally identified

9    himself, and I do believe he showed his credentials at that

10    time.

11    Q.    Did you show your credentials to Mr. Hussien?

12    A.    At that point I don't believe I did.

13    Q.    When did Agent Anderson show his credentials to

14    Mr. Hussien?

15    A.    I don't know the answer to that.

16    Q.    Did Mr. Anderson get in the car with Agent Sauer?

17    A.    Yes, he did.

18    Q.    At the same time?

19    A.    I -- I don't -- I don't recall if it was at the same

20    time or if it was just shortly afterwards.

21    Q.    And Agent Anderson was in the vehicle in order to

22    record this interview.

23    A.    Yes.

24    Q.    Was he armed?

25    A.    I don't know the answer to that.  I assume he was

1    armed.  I don't know for sure, though.

2    Q.    Do you recall whether or not during this period of time

3    whether or not the car was still running?

4    A.    The car -- to my recollection the car was running the

5    entire time.

6    Q.    Okay.

7    A.    At one point I believe the defendant even turned the

8    heat up.

9    Q.    Because it was so cold.

10    A.    That's correct.

11    Q.    And, in fact, that's the excuse the agents used in

12    order to talk their way into the car, right?

13    A.    I don't know -- I don't know what Agent -- Agent Sauer

14    said to the defendant.  I don't recall what he said in order

15    to get in the vehicle.

16    Q.    Have you read the report that was made by Agent Sauer?

17    A.    I -- the written interview report?

18    Q.    Yeah, his report.

19    A.    Yes, yes, I did.

20         MR. STRIKE:  Approach, please, Judge?

21         THE COURT:  You may.

22    BY MR. STRIKE:

23    Q.    I don't want you to read this out loud, please.

24    A.    Okay.

25    Q.    But if you would please review this area right there

1    that I've underlined in blue, not the single word above that

2    but --

3    A.    I read it.

4    Q.    Does that help refresh your recollection at all?

5    A.    I recall what he had -- what Agent Sauer wrote in the

6    report.  I just -- I don't know what Agent Sauer's thinking

7    was other than what he did write in the report.

8    Q.    Which is that he asked the defendant if he could get in

9    the car because it was so cold.

10   A.    That's what's in the report.

11   Q.    How big was defendant's vehicle?

12   A.    It's a Toyota Highlander, which is an SUV, I believe

13   it -- it's an SUV.

14   Q.    In the front of that vehicle you were standing next to

15   the driver's door?

16   A.    That's correct.

17   Q.    And the window was down.

18   A.    The window was down.

19   Q.    And as a result of your closeness to that door you

20   could hear what was being asked and answered.

21   A.    Yes.

22   Q.    And that was the purpose of you standing there, right?

23   A.    The purpose of me standing on the outside of the door

24   was to watch the defendant's hands to make sure everybody was

25   safe and then also to hear the interview.

1  Q.     And, in fact, defendant would not have been able to get

2  out of the car opening that driver's door without hitting you,

3  correct?

4  A.     Yes.  Had he opened the door I would have moved,

5  though.

6  Q.     Right, but you were in the way of his opening the door;

7  is that correct?

8  A.     That's correct.

9  Q.     And you were armed; you just don't know whether or not

10  the defendant saw your weapon.

11  A.     I had a winter coat on so I -- it -- it's possible.  I

12  don't believe he did, though.

13  Q.     You wear a sidearm on your hip, right?

14  A.     On my right hip.

15  Q.     So it's going to create a bulge when you're wearing a

16  coat, correct?

17  A.     Depending on the type of coat.

18  Q.     Prior to this stop were you aware at all of

19  Mr. Hussien's refugee background?

20  A.     Just what Agent Sauer had advised me of.

21  Q.     You were aware that he fled the civil war in Somalia

22  and gone to Kenya?

23  A.     I was not.

24  Q.     Were you aware that he had his throat cut by militia on

25  the way to Kenya?

1    A.    I was not.

2    Q.    Agent Sauer didn't inform you of any of that?

3    A.    I don't believe he did.

4    Q.    That that was done by local militia?  No?  Okay.

5          Agent Sauer sits in the front seat?

6    A.    Front passenger seat.

7    Q.    Passenger side.

8    A.    Yes.

9    Q.    And is that what I will call a bucket seat arrangement

10   versus a bench seat arrangement?  Do you know what I mean by

11   bench seat?

12   A.    I know what you mean.  I didn't pay -- I don't know

13   exactly what type of seating was in that car.  I -- I believe

14   nowadays they're all bucket seats.

15   Q.    I think I'm showing my age.

16          Where in the back of the vehicle did Agent Anderson

17   sit?

18   A.    Agent Anderson sat in the back passenger vehicle

19   because there -- on the back driver's side seat there was a

20   child's car seat.

21   Q.    Okay.  So at Agent Sauer's request -- well, let me

22   rephrase.

23          Agent Sauer had flagged down Mr. Hussien's vehicle,

24   correct?

25   A.    I -- he -- yes, yes.

1    Q.    And he directed Mr. Hussien to pull over to a parking

2    spot on Weaver Lane.

3    A.    He asked him if he would pull over.

4    Q.    You don't remember where Agent Anderson was still at

5    this point.

6    A.    No.

7    Q.    Did the defendant ever have the opportunity to get out

8    of his car prior to Agent Sauer getting in it?

9    A.    He could have.  As soon as he parked his vehicle he

10    could have exited the vehicle.

11    Q.    Weren't you standing right next to the door?

12    A.    I eventually -- he drove over to it and then I -- we

13    walked over to the vehicle, so there was a little bit of time

14    there.

15    Q.    All right.  Now, at some point Agent Sauer began asking

16    Mr. Hussien a variety of questions, correct?

17    A.    Yes.

18    Q.    Okay.  And you've listened to the transcript, as you

19    indicated earlier in the testimony?

20    A.    Yes, I listened to the audio recording and read the

21    transcript.

22    Q.    Okay.  Now, very early on Agent Sauer gives a verbal

23    rendition of what I will call the False Statement Act; is that

24    correct?

25    A.    Yes.

1    Q.    And you heard him do that?

2    A.    Yes, I did.

3    Q.    Now, I know it's on the tape, but at any point during

4    Agent Sauer's recitation of this did he pause or stop?

5    A.    In the middle of speaking?

6    Q.    Yeah, while he was giving this false statement warning

7    to my client, he just breezed through the whole thing,

8    correct?

9    A.    I -- I don't recall.  I'd have to listen to the audio

10   recording again.

11   Q.    Okay.

12   A.    I don't know if he paused while he was reading.

13         THE COURT:  Mr. Strike, that's either obvious or not

14   by the --

15         MR. STRIKE:  Very good, Judge.

16   BY MR. STRIKE:

17   Q.    At the end of the recitation of the False Statement

18   Act, Agent Sauer mentioned an example, correct?

19   A.    Yes.

20   Q.    And Mr. Hussien did not understand what Agent Sauer was

21   trying to explain to him; is that correct?

22   A.    I believe the defendant indicated that he didn't

23   understand the reference that Agent Sauer was making to who I

24   believe was General Flynn.

25   Q.    And, in fact, Mr. Hussien never made any acknowledgment

1    that he understood what Agent Sauer had recited to him as far

2    as the False Statement Act.

3    A.    That's correct.

4    Q.    Now, during that recording, right at the end of the

5    False Statement Act, Agent Sauer says I have a Somali version

6    of this.  Is he talking about the False Statement Act?

7    A.    To my recollection I want to say that that was the

8    Miranda warnings.

9    Q.    But we don't get to the Miranda warnings until a little

10   bit further down the road; do we?

11   A.    Right after the 1001 False Statement Act.

12   Q.    Well, right after the -- right.  But before you get

13   into the Miranda warning he asks my client if he can read

14   something in Somali, correct?

15   A.    I -- to my recollection I -- I believe that he -- Agent

16   Sauer had a file containing a bunch of documents on his lap.

17   And he read off of one of the documents, the 1001 statement.

18   And then I believe at that point he was going to start talking

19   about Miranda, and that's when he said I have this in English

20   and Somali.

21        MR. STRIKE:  Approach, please, Judge?

22        THE COURT:  You may.

23   BY MR. STRIKE:

24   Q.    I'd like you to look at the bottom of Page 2 and

25   Page 3, up to the point that Agent Sauer begins to invoke

1  Miranda.

2  A.    Okay.

3  Q.    Please don't read it out loud, just to yourself.  I'm

4  going to ask you again after -- does that refresh your

5  recollection, by the way?

6  A.    It does not.

7  Q.    Based on what you've read, could it be that what Agent

8  Sauer showed my client was a Somali version of the False

9  Statement?

10  A.    It could be.

11  Q.    Very good, okay.

12  A.    But I do --

13  Q.    So you don't --

14        THE COURT:  Just a second.

15  A.    But I do know that Agent Sauer did show the defendant

16  the Miranda warnings in Somali.

17  BY MR. STRIKE:

18  Q.    Okay.  And, in fact, my client indicated that he didn't

19  understand the Somali writing; isn't that correct?

20  A.    He did.

21  Q.    And that indication that he gave you that he couldn't

22  read the Somali language was in fact before Agent Sauer read

23  him Miranda; is that correct?

24  A.    That's correct.

25  Q.    Now, at the end of the recitation of Miranda, did my

1    client indicate he understood what Agent Sauer had read to

2    him?

3    A.    Did you say he understood or did not understand?

4    Q.    Did Mr. Hussien --

5         THE COURT:  He's asking you did the defendant

6    indicate he understood, question mark.

7    A.    No.

8    BY MR. STRIKE:

9    Q.    Did he in fact indicate that he did not understand?

10   A.    Yes.

11   Q.    And at that point did Agent Sauer attempt to explain

12   Miranda warning to Mr. Hussien?

13   A.    No.

14   Q.    So you would agree with me at this point that it

15   appears that Mr. Hussien was unaware of the rights that he had

16   at the time he was answering Agent Sauer's questions.

17   A.    I don't know what the defendant knows about Miranda or

18   his rights.  I just know that he indicated he didn't

19   understand the written document.

20   Q.    Well, he didn't understand the spoken part, either; did

21   he?

22   A.    I don't know if he did.

23        THE COURT:  All right, let me see if I can clarify

24   what's going on here.

25        MR. STRIKE:  Sorry, Judge.

1        THE COURT:  That's all right; it's not your fault.

2      When he was given the written Miranda rights in Somali,

3  one version of what is Somali, he indicated he didn't

4  understand.

5        THE WITNESS:  That's correct.

6        THE COURT:  According to the audio, Agent Sauer then

7  told him the Miranda rights in English.

8        THE WITNESS:  That's correct.

9        THE COURT:  What did the defendant say after he

10  heard this -- the rights in English?  Did he say I understand

11  or did he say I don't understand or did he say something else?

12        THE WITNESS:  I would have to refer to the

13  transcript -- I would have to refer to the transcript to be

14  certain, but I believe that the defendant indicated that he

15  didn't understand but then he proceeded to say, what do you

16  want to know, which was what initiated the remainder of the

17  interview.

18        THE COURT:  Okay.

19  BY MR. STRIKE:

20  Q.    In fact, he said, give me the picture information, what

21  do you want to know; is that correct?

22  A.    That's correct.  And I don't know -- I don't know if

23  the defendant didn't understand the Miranda or if it -- he

24  wasn't able to read the document.  I don't know if he didn't

25  understand the words, was not -- didn't understand how to read

1    the document, or if he didn't understand the verbal Miranda

2    warnings that were read to him as well.  But he did continue

3    with the interview and said what do you want to know.

4    Q.    Right.  But he never acknowledged he understood his

5    rights.

6    A.    No, he didn't.

7    Q.    And there was never any explanation of his rights other

8    than the quick read off the Miranda card.

9    A.    That's correct.

10    Q.    All right.  Now, at any point during this 45-minute

11    interview or thereabouts did anybody tell Mr. Hussien that he

12    could leave at any time he wanted to?

13    A.    No.

14    Q.    Okay.  Do you know whether or not Mr. Hussien knew,

15    based on your recollection, whether or not he could ask for an

16    attorney?

17            MR. CHAPMAN:  I'm sorry, I didn't hear the last half

18    of that question.

19            THE COURT:  He's asking what his client's mind was.

20            MR. CHAPMAN:  I'm going to object to that.

21            THE COURT:  I'm going to sustain that.

22            MR. STRIKE:  Very good, Judge.

23    BY MR. STRIKE:

24    Q.    But he never asked for counsel; did he?

25    A.    No, he didn't.  And I'd like to add that he never asked

1   for the interview to stop.

2   Q.    I understand that.  You knew that Mr. Hussien went to

3   work at approximately 2:00 o'clock; is that correct?

4   A.    I did know that.

5   Q.    You did?

6   A.    I know that now; I don't know if I knew it at that

7   moment or not.

8   Q.    Then why not, when you found Mr. Hussien, conduct the

9   interview at local offices?

10  A.    Are you -- can you repeat the question?

11  Q.    Was there no facility that you could have gone to to

12  conduct that interview other than in Mr. Hussien's car?

13  A.    Well, we initially were going to interview him at his

14  residence.

15  Q.    Right, okay.  Why not ask him to go back to the

16  residence for the interview?

17  A.    Because we were right there, he agreed to -- to pull

18  over and to the interview.

19  Q.    When you found out or at least as you understood that

20  he did not understand the False Statement Act and the Miranda,

21  why not get a Somali interpreter?

22  A.    We were there; we didn't have a Somali interpreter.

23  Q.    You knew he spoke Somali, yes?

24  A.    I didn't know what he spoke at that point.  Agent

25  Sauer, I believe, might have known that information.  I did

1    not know.

2    Q.    Would it be fair to say that, based on the transcript,

3    a number of things had to be reasked of Mr. Hussien before he

4    understood, correct?

5    A.    There were instances of that, yes.

6    Q.    And, by the way, that -- the overhead shot of the TD

7    Bank, that's not Mr. Hussien's vehicle, is it, in number 2?

8    That's just a random vehicle?

9    A.    That's not his vehicle.

10    Q.    That's just a random vehicle?

11    A.    Yes.

12              MR. STRIKE:  A moment, please, Judge?

13              THE COURT:  Sure.

14                   (Defense counsel conferred.)

15    BY MR. STRIKE:

16    Q.    During the course of the interview, based on the

17    positioning of both yourself, Agent Sauer, and Agent Anderson,

18    would it have been possible for my client to leave without

19    having to go through one or the other of you?

20    A.    He could have backed up; is that what you mean?

21    Q.    No, during the interview, he couldn't get out the

22    passenger's side because Agent Sauer was there, right?

23    A.    That's correct.  Well --

24    Q.    And he couldn't exit through the back of the vehicle

25    because Agent Anderson was there.

1   A.    That's correct.

2   Q.    And he couldn't exit through the driver's door because

3   you were standing in the way.

4   A.    I would have moved over.

5   Q.    He didn't know that.

6   A.    I don't know what he knew.

7   Q.    Correct.

8           MR. STRIKE:  Nothing further, Judge.

9           THE COURT:  Thank you.  Redirect?

10          MR. CHAPMAN:  Yes.

11                    REDIRECT EXAMINATION

12  BY MR. CHAPMAN:

13  Q.    Agent Rocheleau, fair to say that you weren't the lead

14  person in this interview?

15  A.    That's correct.

16  Q.    And who was the lead investigator in this case?

17  A.    Agent Sauer.

18  Q.    So who made decisions about whether or not there was

19  going to be an interpreter present or where the interview was

20  going to take place?

21  A.    Agent Sauer.

22  Q.    Now, Mr. Strike asked you some questions with respect

23  to the first encounter that you had with the defendant as he

24  was about to leave the drive-through area behind the bank.  Do

25  you remember those questions?

1    A.    Yes, I do.

2    Q.    And I believe he asked you about a stop.  Did you stop

3    the defendant from exiting?

4    A.    We -- I don't believe that we stopped.  The defendant

5    was pulling out of the drive-through area, which is -- it's

6    a -- the parking lot very -- right after the drive-through

7    area ends and it actually turns into a road, Weaver Lane.

8    Agent Sauer -- as soon as we were walking up we saw the

9    vehicle starting to pull out, so Agent Sauer did get the

10    defendant's attention.

11    Q.    Okay.  And when he got the defendant's attention, did

12    the defendant come to a stop?

13    A.    Yes.

14    Q.    And that's when Agent Sauer asked him if he could speak

15    to him about his passport.

16    A.    That's correct.

17    Q.    Did Agent Sauer tell him what to do next or direct him

18    where to go?

19    A.    He asked if he would pull over into one of the parking

20    spots.

21    Q.    Okay.  And the defendant understood those directions?

22    A.    Yes, he did.

23    Q.    Now, after he pulled into the parking spot, could you

24    hear what the defendant was saying -- what Agent Sauer was

25    saying to the defendant, if anything, before he got into the

1    front passenger seat?

2    A.    I don't recall.

3    Q.    Okay.  Now, as I understand the situation in the

4    vehicle, defendant's behind the wheel, Agent Sauer is sitting

5    next to him in the front.

6    A.    Yes.

7    Q.    And Agent Anderson is sitting behind Agent Sauer in the

8    back, right?

9    A.    Yes.

10    Q.    And then you're standing outside the driver's door.

11    A.    Yes.

12    Q.    Now, with respect to the 1001 warning and the Miranda

13    warning, your recollection is that the forms that Agent Sauer

14    asked him to read were related to the Miranda warning?

15    A.    That's what I recall.

16    Q.    And do you still have the transcript in front of you?

17    A.    I do.

18    Q.    Let me direct your attention to Page 3 where it

19    indicates that Agent Sauer on Line 5 says, so this is -- I

20    have the Somali version here someplace, right here, okay.  So

21    this basically says the same thing.  If you want to take a

22    read over that, you can read it in English or Somali and tell

23    me you understand it.  Can you tell us at this point what he

24    was referring to at that point?

25    A.    My recollection is that that was the Miranda warnings.

1    He had -- Agent Sauer had them written -- printed out in

2    English on one page and another page in Somali.

3    Q.    All right.  And the defendant's response was, I can't

4    reading -- I don't understand the reading or the information.

5    So is he referring to the form then?

6    A.    That's my understanding.

7    Q.    And then Agent Sauer refers him to the English version

8    on the other page, right?

9    A.    Yes.

10    Q.    And then the defendant's response was, no, I can't read

11    that at this time.  I need more explained, this explanation.

12    So then Agent Sauer gives him a verbal recitation of his

13    Miranda warnings, right?

14    A.    That's correct.

15    Q.    Now, after he does that, Agent Sauer on Page 4 says, do

16    you understand all that stuff?  At that point Mr. Hussien

17    says, I need more information about this, the Somali language,

18    before I can -- I don't understand this.  What is the "this"?

19          MR. STRIKE:  Judge, that calls for speculation.

20    She's going --

21          THE COURT:  I agree with you.  What is it -- do you

22    remember what the defendant was indicating, if anything, at

23    that time?

24          THE WITNESS:  The written Miranda warnings.

25          THE COURT:  Go ahead, next question.

```
 1              MR. CHAPMAN:  Okay.

 2   BY MR. CHAPMAN:

 3   Q.     Did he ask for any explanation of the warnings that

 4   Agent Sauer verbally gave him?

 5   A.     No.  He did ask for -- no, overall, though, he asked

 6   for more information, that he didn't understand the written,

 7   and it's possible that he didn't understand the verbal.

 8   Q.     Okay.  Now, after the defendant asked Agent Sauer words

 9   to the effect of, you know, what is this about, tell me what

10   you want to know, is that when the questioning began?

11   A.     Yes.

12   Q.     What would you have done if the defendant said no to

13   the interview?

14   A.     We would have left.  The interview wouldn't have taken

15   place.

16   Q.     What would you have done if he asked to speak to you at

17   some other time?

18   A.     The interview wouldn't have taken place.

19              MR. CHAPMAN:  Nothing further.

20              THE COURT:  Mr. Strike, recross?

21                        RECROSS-EXAMINATION

22   BY MR. STRIKE:

23   Q.     You never gave him that option; did you?

24   A.     What option?

25   Q.     About doing the interview at another time.
```

1    A.    He was willing to do the interview then.  He asked --

2    Q.    Did you give him the option to do the interview at

3    another time?

4    A.    I -- we don't usually give options to do the interview

5    at another time.  We were there, he said what do you want to

6    know, so the interview continued.

7    Q.    Now, I understand from Special Agent Sauer's report

8    that he actually flagged down defendant's vehicle.  Would that

9    be accurate?

10   A.    His -- his word is flagged.  He might have said can I

11   speak with you for a minute or --

12   Q.    You don't know what he said to the defendant; do you?

13   A.    I don't recall the exact words, no.

14   Q.    But flagged him down means he got the --

15   A.    He might have, as --

16        THE COURT:  If she doesn't see it, he might have

17   doesn't help me a whole lot.

18        MR. STRIKE:  Okay, Judge.

19   BY MR. STRIKE:

20   Q.    In any case, Agent Sauer had the vehicle stop.

21   A.    Yes.

22   Q.    Agent Sauer directed the vehicle to park over in a slot

23   on Weaver Street.

24   A.    Agent Sauer explained that he -- identified himself and

25   explained that he would like to speak with the defendant

1    regarding some passport issues.  The defendant agreed, and

2    Agent Sauer asked him if he would be able to pull over into

3    one of the parking spots, to which the defendant agreed and he

4    did pull over.

5    Q.    And at the time he pulled over it was you, Agent

6    Anderson, and Agent Sauer, correct?

7    A.    I don't know where Agent Anderson was at that time.  I

8    wasn't able to -- I didn't see behind me.  So Agent Anderson

9    could have been standing behind me.  All I know is that Agent

10   Sauer was in front of me, and then when we walked over to the

11   vehicle Agent Anderson was then on my right side.

12   Q.    Passenger side?

13   A.    No, he was on the driver's side.

14   Q.    And then walked around the vehicle?

15   A.    And then walked around.

16   Q.    Now, in response -- and I'm looking at Pages 3 and 4 of

17   the transcript, which I believe you have in front of you.

18   A.    I do.

19   Q.    On Line 17, Page 3, I can't read this at this time, I

20   need more explanation, this explanation, correct?

21   A.    That's what it says.

22   Q.    Do you know whether or not Mr. Hussien was referring to

23   the False Statement Act?

24   A.    My recollection is that he was referring to the Miranda

25   warnings.

1    Q.    But Miranda had not been read to him yet; had it?

2    A.    No, but he was given the documents, and then when he

3    indicated that he didn't understand the writing, that's when

4    it was verbally read to him.

5    Q.    And even at the end of that he indicated, I don't

6    understand this, correct?

7    A.    Correct.

8         MR. STRIKE:  Nothing further, Judge.

9         THE COURT:  Anything else?

10        MR. CHAPMAN:  No, Your Honor.

11        THE COURT:  Thank you, you may step down.

12    Do you have another witness?

13        MR. CHAPMAN:  No, Government rests.

14        THE COURT:  Very good.

15        MR. STRIKE:  Defense rests.

16        THE COURT:  Very good.  Okay, counsel, I'm prepared

17    to review what my notes are and make a decision.  Is there

18    anything anyone wants to file in this matter?  I've read your

19    motion and response.

20        MR. CHAPMAN:  I'll rest on what I filed already,

21    Judge.

22        THE COURT:  Mr. Strike?

23        MR. STRIKE:  A moment, Judge?

24        THE COURT:  Sure.

25        MR. STRIKE:  No, Judge, that will be fine.

1          THE COURT:  Very good.  Then I'll take it under

2    advisement, and we're in recess.

3          MR. STRIKE:  Thank you, Judge.

4                (Time noted:  2:25 p.m.)

5

6

7                **C E R T I F I C A T I O N**

8    I, Lori D. Dunbar, Registered Merit Reporter, Certified

9    Realtime Reporter, and Official Court Reporter for the United

10   States District Court, District of Maine, certify that the

11   foregoing is a correct transcript from the record of

12   proceedings in the above-entitled matter.

13   Dated:  April 2, 2019

14              /s/ Lori D. Dunbar

15              Official Court Reporter

16

17

18

19

20

21

22

23

24

25